BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
ALEX J. TRAMONTANO (276666)
tramontano@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COLBY MAYES, Derivatively on Behalf of Nominal Defendant GOODRX HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DOUGLAS HIRSCH, TREVOR BEZDEK, CHRISTOPHER ADAMS, JULIE BRADLEY, DIPANJAN DEB, AGNES REY-GIRAUD, ADAM KAROL, JACQUELINE KOSECOFF, STEPHEN LESIEUR, GREGORY MONDRE, and KARSTEN VOERMANN, <br><br> Defendants, <br><br> and <br><br> GOODRX HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Colby Mayes ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant GoodRx Holdings, Inc. ("GoodRx" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding GoodRx, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Barsuli v. GoodRx, Inc., et al.,* Case No. 2:24-cv-03282-AB-AJR (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought by Plaintiff on behalf of GoodRx against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least September 23, 2020 and November 8, 2022, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.     GoodRx operates a price comparison platform for prescription medicines, offering consumers discounted prices for medicines at participating pharmacies.

3.     GoodRx entered into an agreement with The Kroger Co. ("Kroger"), whereby subscribers could pay an annual fee to GoodRx for access to discounted prescription medications at pharmacies operated by Kroger (the "Kroger Rx Savings

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Club Plan"). GoodRx shared the subscription fees with Kroger.

4. Unbeknownst to shareholders and the public, the Kroger Rx Savings Club Plan generated 25% of GoodRx's total prescription transactions revenue, despite Kroger pharmacies accounting for less than 5% of the pharmacies accepting GoodRx discounts. Further, Kroger retained the right to unilaterally refuse to accept GoodRx discounts. Accordingly, there was a substantial and undisclosed risk associated with the Kroger Rx Savings Club Plan.

5. On May 10, 2022, the Company revealed in a quarterly report that "a grocery chain had taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs."

6. During an earnings call held the same day, the Company further disclosed that the "grocer issue" accounted for "almost 1/4 of its prescription transaction revenue," while only accounting for less than 5% of the pharmacies that accept GoodRx discounts.

7. On this news, the price of the Company's stock declined by roughly 25% in one day, closing at $7.97 per share on May 10, 2022.

8. In a press release, issued by the Company on November 8, 2022, GoodRx further revealed that "[t]he estimated impact of the grocer issue on third quarter [prescription transactions revenue] was approximately $40 million." The Company further disclosed that it expected a $45 to $50 million "estimated impact to prescription transactions revenue related to the previously disclosed grocer issue."

9. During an earnings call held the same day, Defendant Bezdek disclosed that the "amount of prescription transactions revenue associated with the grocer decreased from $12.4 million to $4.3 million during th[e] period and [wa]s still well under the $33.7 million from third quarter 2021." Further, Defendant Hirsch revealed that Kroger had retained the right to unilaterally refuse to accept GoodRx discounts.

10.     On this news, the price of the Company's stock declined by roughly 22% in one day, closing at $4.06 per share on November 9, 2022.

11.     As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

12.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)).

14.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

19.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because GoodRx maintains its principal place of business in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

20.    Plaintiff is, and has been at all relevant times, a shareholder of GoodRx.

*Nominal Defendant*

21.    Nominal Defendant GoodRx is incorporated under the laws of Delaware with its principal executive offices located at 2701 Olympic Boulevard, Santa Monica, California, 90404. GoodRx's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "GDRX."

*Individual Defendants*

22.    Defendant Douglas Hirsch ("Hirsch") is one of the Company's Co-Founders and has served as a member of the Board since September 2011 and as the Company's Chief Mission Officer since April 2023. Defendant Hirsch previously served as the Company's Co-Chief Executive Officer ("Co-CEO") from the Company's founding until April 2023. According to the Company's public filings, Defendant Hirsch received $879,104 in 2021 in compensation from the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

As of April 8, 2024, Defendant Hirsch beneficially owned 5,138,890 shares of GoodRx Class A common stock, worth $35,150,007.[1] During the Relevant Period, Defendant Hirsch sold 519,190 shares of Company stock while in possession of material non-public information for proceeds of $20,419,377. While the price of GoodRx stock was artificially inflated due to the Individual Defendants' false and misleading statements described herein, Defendant Hirsch made the following sales of Company stock:

- On March 22, 2021, Defendant Hirsch sold 131,066 shares of personal holdings of Company stock at an average price of $36.63 per share, reaping $4,800,410 in proceeds.

- On June 23, 2021, Defendant Hirsch sold 94,615 shares of personal holdings of Company stock at an average price of $37.90 per share, reaping $3,585,908 in proceeds.

- On June 24, 2021, Defendant Hirsch sold 34,760 shares of personal holdings of Company stock at an average price of $38.49 per share, reaping $1,337,815 in proceeds.

- On September 24, 2021, Defendant Hirsch sold 123,422 shares of personal holdings of Company stock at an average price of $45.24 per share, reaping $5,583,611 in proceeds.

- On September 27, 2021, Defendant Hirsch sold 5,952 shares of personal holdings of Company stock at an average price of $43.26 per share, reaping $257,483 in proceeds.

- On December 15, 2021, Defendant Hirsch sold 129,375 shares of personal holdings of Company stock at an average price of $37.52 per

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $6.84 per share closing price of GoodRx's stock on April 8, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

share, reaping $4,854,150 in proceeds.

23.    Defendant Trevor Bezdek ("Bezdek") is one of the Company's Co-Founders and has served as Chairman of the Board since April 2023 and as a member of the Board since 2011. Defendant Bezdek previously served as the Company's Co-CEO from the Company's founding until April 2023. According to the Company's public filings, Defendant Bezdek received $891,681 in 2021 in compensation from the Company. As of April 8, 2024, Defendant Bezdek beneficially owned 5,138,890 shares of GoodRx Class A common stock, worth $35,150,007. During the Relevant Period, Defendant Bezdek sold 519,190 shares of Company stock while in possession of material non-public information for proceeds of $20,053,364. While the price of GoodRx stock was artificially inflated due to the Individual Defendants' false and misleading statements described herein, Defendant Bezdek made the following sales of Company stock:

- On March 22, 2021, Defendant Bezdek sold 131,066 shares of personal holdings of Company stock at an average price of $36.77 per share, reaping $4,819,296 in proceeds.

- On June 23, 2021, Defendant Bezdek sold 94,855 shares of personal holdings of Company stock at an average price of $37.90 per share, reaping $3,595,004 in proceeds.

- On June 24, 2021, Defendant Bezdek sold 34,520 shares of personal holdings of Company stock at an average price of $38.48 per share, reaping $1,328,329 in proceeds.

- On September 24, 2021, Defendant Bezdek sold 124,370 shares of personal holdings of Company stock at an average price of $45.19 per share, reaping $5,620,280 in proceeds.

- On September 27, 2021, Defendant Bezdek sold 5,004 shares of personal holdings of Company stock at an average price of $43.27 per

share, reaping $216,523 in proceeds.

- On December 22, 2021, Defendant Bezdek sold 64,271 shares of personal holdings of Company stock at an average price of $35.19 per share, reaping $2,261,696 in proceeds.

- On December 23, 2021, Defendant Bezdek sold 65,104 shares of personal holdings of Company stock at an average price of $33.98 per share, reaping $2,212,233 in proceeds.

24.    Defendant Christopher Adams ("Adams") has served as a member of the Board since October 2015 and serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

25.    Defendant Julie Bradley ("Bradley") has served as a member of the Board since August 2020 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Bradley received $277,536 in 2021 in compensation from the Company. As of April 8, 2024, Defendant Bradley beneficially owned 56,078 shares of GoodRx Class A common stock, worth $383,573.

26.    Defendant Dipanjan Deb ("Deb") has served as a member of the Board since August 2015.

27.    Defendant Agnes Rey-Giraud ("Giraud") has served as a member of the Board since June 2016 and serves as the Chair of the Compliance Committee and as a member of the Audit Committee. According to the Company's public filings, Defendant Giraud received $276,199 in 2021 in compensation from the Company. As of April 8, 2024, Defendant Giraud beneficially owned 255,763 shares of GoodRx Class A common stock, worth $1,749,418. During the Relevant Period, Defendant Giraud sold 129,370 shares of Company stock while in possession of material non-public information for proceeds of $5,294,565. While the price of GoodRx stock was artificially inflated due to the Individual Defendants' false and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misleading statements described herein, Defendant Giraud made the following sales of Company stock:

- On September 7, 2021, Defendant Giraud sold 54,370 shares of personal holdings of Company stock at an average price of $41.56 per share, reaping $2,259,617 in proceeds.

- On September 14, 2021, Defendant Giraud sold 14,454 shares of personal holdings of Company stock at an average price of $45.00 per share, reaping $650,430 in proceeds.

- On September 15, 2021, Defendant Giraud sold 4,637 shares of personal holdings of Company stock at an average price of $45.03 per share, reaping $208,804 in proceeds.

- On September 16, 2021, Defendant Giraud sold 5,909 shares of personal holdings of Company stock at an average price of $45.01 per share, reaping $265,964 in proceeds.

- On March 22, 2021, Defendant Giraud sold 25,000 shares of personal holdings of Company stock at an average price of $36.38 per share, reaping $909,500 in proceeds.

- On April 1, 2021, Defendant Giraud sold 25,000 shares of personal holdings of Company stock at an average price of $40.01 per share, reaping $1,000,250 in proceeds.

28.   Defendant Gregory Mondre ("Mondre") has served as a member of the Board since October 2018 and serves as Chair of the Compensation Committee.

***Former Director Defendants***

29.   Defendant Adam Karol ("Karol") served as a member of the Board between 2018 and March 2024.

30.   Defendant Jacqueline Kosecoff ("Kosecoff") served as a member of the Board between 2016 and July 2023. According to the Company's public filings,

Defendant Kosecoff received $267,003 in 2021 in compensation from the Company.

31.    Defendant Stephen LeSieur ("LeSieur") served as a member of the Baord between 2015 and March 2024.

***Officer Defendant***

32.    Defendant Karsten Voermann ("Voermann") has served as the Company's Chief Financial Officer ("CFO") since March 2020. According to the Company's public filings, Defendant Voermann received $520,970 in 2021 in compensation from the Company. As of April 8, 2024, Defendant Voermann beneficially owned 554,452 shares of GoodRx Class A common stock, worth $3,792,451. During the Relevant Period, Defendant Voermann sold 245,000 shares of Company stock while in possession of material non-public information for proceeds of $9,013,400. While the price of GoodRx stock was artificially inflated due to the Individual Defendants' false and misleading statements described herein, Defendant Voermann made the following sales of Company stock:

- On March 29, 2021, Defendant Voermann sold 150,000 shares of personal holdings of Company stock at an average price of $37.76 per share, reaping $5,664,000 in proceeds.

- On April 28, 2021, Defendant Voermann sold 12,500 shares of personal holdings of Company stock at an average price of $40.64 per share, reaping $508,000 in proceeds.

- On May 28, 2021, Defendant Voermann sold 12,500 shares of personal holdings of Company stock at an average price of $38.39 per share, reaping $479,875 in proceeds.

- On July 28, 2021, Defendant Voermann sold 12,500 shares of personal holdings of Company stock at an average price of $32.69 per share, reaping $408,625 in proceeds.

- On August 30, 2021, Defendant Voermann sold 12,500 shares of

personal holdings of Company stock at an average price of $37.35 per share, reaping $466,875 in proceeds.

- On September 28, 2021, Defendant Voermann sold 7,500 shares of personal holdings of Company stock at an average price of $40.87 per share, reaping $306,525 in proceeds.

- On November 1, 2021, Defendant Voermann sold 12,500 shares of personal holdings of Company stock at an average price of $22.02 per share, reaping $275,250 in proceeds.

- On December 1, 2021, Defendant Voermann sold 12,500 shares of personal holdings of Company stock at an average price of $39.29 per share, reaping $491,125 in proceeds.

- On December 28, 2021, Defendant Voermann sold 12,500 shares of personal holdings of Company stock at an average price of $33.05 per share, reaping $413,125 in proceeds.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.    By reason of their positions as officers and/or directors of GoodRx, and because of their ability to control the business and corporate affairs of GoodRx, the Individual Defendants owed GoodRx and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GoodRx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GoodRx and its shareholders so as to benefit all shareholders equally.

34.    Each director and officer of the Company owes to GoodRx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

35.    The Individual Defendants, because of their positions of control and

1  authority as directors and/or officers of GoodRx, were able to and did, directly and/or

2  indirectly, exercise control over the wrongful acts complained of herein.

3       36.    To discharge their duties, the officers and directors of GoodRx were

4  required to exercise reasonable and prudent supervision over the management,

5  policies, controls, and operations of the Company.

6       37.    Each Individual Defendant, by virtue of his or her position as a director

7  and/or officer owed to the Company and to its shareholders the highest fiduciary

8  duties of loyalty, good faith, and the exercise of due care and diligence in the

9  management and administration of the affairs of the Company, as well as in the use

10 and preservation of its property and assets. The conduct of the Individual Defendants

11 complained of herein involves a knowing and culpable violation of their obligations

12 as directors and/or officers of GoodRx, the absence of good faith on their part, or a

13 reckless disregard for their duties to the Company and its shareholders that the

14 Individual Defendants were aware or should have been aware posed a risk of serious

15 injury to the Company.

16      38.    As senior executive officers and directors of a publicly-traded company

17 whose common stock was registered with the SEC pursuant to the Exchange Act and

18 traded on the NASDAQ, the Individual Defendants had a duty: to ensure that

19 GoodRx implemented and properly monitored the Company's internal controls; to

20 prevent the dissemination of inaccurate and untruthful information with respect to

21 the Company's financial condition, performance, growth, financial statements,

22 products, management, internal controls, earnings, and present and future business

23 prospects, including the dissemination of false and/or materially misleading

24 information regarding the Company's business, prospects, and operations; and to

25 cause the Company to disclose in its regulatory filings with the SEC all those facts

26 described in this Complaint that it failed to disclose, so that the market price of the

27 Company's common stock would be based upon truthful, accurate, and fairly

28

presented information.

39.  To discharge their duties, the officers and directors of GoodRx were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of GoodRx were required to, among other things:

(a)  ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to GoodRx's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)  remain informed as to how GoodRx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of GoodRx and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that GoodRx's publicly disclosed financial information

would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

40.    Each of the Individual Defendants further owed to GoodRx and the shareholders the duty of loyalty requiring that each favor GoodRx's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

41.    At all times relevant hereto, the Individual Defendants were the agents of each other and of GoodRx and were at all times acting within the course and scope of such agency.

42.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GoodRx.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

43.    In committing the wrongful acts alleged herein, the Individual

Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

45.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

46.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of GoodRx, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

48.    At all times relevant hereto, each of the Individual Defendants was the

agent of each of the other Individual Defendants and of GoodRx and at all times acted within the course and scope of such agency.

## **GOODRX'S CODE OF CONDUCT**

49.    GoodRx's Code of Conduct begins with a commitment to "conducting the business of GoodRx . . . consistent with the highest standards of business ethics."

50.    The Code of Conduct applies to all of the Company's "directors, officers and other employees," and violations of the Code of Conduct will lead to "appropriate discipline, which may include for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors."

51.    In a section titled "**Company Records**," the Code of Conduct states: "Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. . . . All Company records must be complete, accurate and reliable."

52.    In a section titled "**Accuracy of Financial Reports and Other Public Communications**," the Code of Conduct states:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly

comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

53.    In a section titled "**Compliance with Laws and Regulations,**" the Code of Conduct states, in pertinent part, that "[e]ach employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations."

54.    In a subsection titled "Compliance with Insider Trading Laws," the Code of Conduct states, in pertinent part, that "the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company."

55.    In a subsection titled "Public Communications Generally," the Code of Conduct states, in pertinent part:

> The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests.

## GOODRX'S AUDIT COMMITTEE CHARTER

56.    Pursuant to GoodRx's Audit Committee Charter, the purpose of the Audit Committee is to:

    (i)    Oversee the accounting and financial reporting processes of GoodRx Holdings, Inc. (the "Company") and the audits of the financial statements of the Company;

    (ii)    assist the Board in discharging its oversight responsibilities with respect to compliance with federal

and state laws and regulations applicable to the Company's business;

(iii) assist the Board in overseeing the overall risk management of the Company and oversee certain material risk exposures of the Company; and

(iv) oversee the Company's internal audit function.

57. In a subsection titled "*Annual Financial Statements and Annual Audit*," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- *Audit Problems.* The Committee must discuss with the independent auditor any audit problems, financial reporting issues or difficulties in connection with the preparation of the Company's financial statements and management's response.

- *Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

58. In a subsection titled "*Quarterly Financial Statements*," the Audit Committee Charter states that the Audit Committee shall "review and discuss the quarterly financial statements with management and the independent auditor,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'"

59.    With respect to risk management, the Audit Committee Charter states that the Audit Committee shall "review and discuss the Company's policies and procedures with respect to risk assessment and risk management." Specifically, the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- <u>Financial and Enterprise Risk.</u> The Committee will review and assess, at least annually, the Company's major financial and enterprise risk exposures, including fraud risks, and the steps management has taken to monitor or mitigate such exposures.

- <u>Other Risk Oversight.</u> The Committee will review and assess the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time; however, the Committee shall not be responsible for the detailed oversight of any risk exposures that have been delegated by the Board to another committee of the Board.

60.    The Audit Committee Charter further tasks the Audit Committee with the following responsibilities:

- *Review of Earnings Releases.* The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

- *Oversight of Compliance.* The Committee shall provide general oversight of the Company's compliance processes and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

procedures and monitor its performance with respect to the legal
and regulatory requirements applicable to the Company's
business.

## SUBSTANTIVE ALLEGATIONS

*Background*

61.    GoodRx operates a price comparison platform for prescription
medicines, offering consumers discounted prices for medicines at participating
pharmacies.

62.    GoodRx generates most of its revenue through agreements with
pharmacy benefit managers ("PBM"). Pursuant to the agreements, PBMs pay
GoodRx commissions on every purchase of prescription medication by consumers
using the Company's coupons and discount codes.

63.    GoodRx also generates revenue from the sale of subscription plans to
consumers. For instance, GoodRx entered into the Kroger Rx Savings Club Plan,
whereby subscribers could pay an annual fee to GoodRx for access to discounted
prescription medications at pharmacies operated by Kroger. GoodRx would then
receive revenues from commissions on each purchase of medication from Kroger
pharmacies and from subscription fees which it shared with Kroger.

64.    Unbeknownst to shareholders and the public, the Kroger Rx Savings
Club Plan generated 25% of GoodRx's total prescription transactions revenue,
despite Kroger pharmacies accounting for less than 5% of the pharmacies accepting
GoodRx discounts. Further, Kroger retained the right to unilaterally refuse to accept
GoodRx discounts. Accordingly, there was a substantial and undisclosed risk
associated with the Kroger Rx Savings Club Plan.

*False and Misleading Statements*

65.    GoodRx filed a prospectus on Form 424b4 with the SEC on September

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

22, 2020 in connection with its upcoming initial public offering ("IPO") on
September 23, 2020. The Prospectus touted the Company's relationship with
Kroger, stating that "[w]e partner with Kroger, the fourth largest retail pharmacy in
the United States, to offer a tailored subscription product to Kroger consumers . . .
We manage key aspects of the program, including subscriber registration, consumer
billing, transaction processing and marketing."

66.    In a section titled "How We Make Money," the Prospectus touted the
Kroger Rx Savings Plan without disclosing the substantial risks associated with the
agreement:

> When a consumer uses a GoodRx code to fill a prescription … we
> receive fees from our partners, primarily PBMs. The fees can be a
> percentage of the fees that our partners earn or a fixed payment per
> transaction. Revenue from prescription transactions fees made up
> approximately 94% of our revenue in 2019 and 91% of revenue in the
> first half of 2020. We have seen strong repeat activity on our platform
> due to the typical refill cycle and long-term nature of most
> prescriptions.
>
> \* \* \*
>
> *Subscription Offerings:* Our subscription offerings are a natural
> extension of our successful prescription offering, as they address the
> same consumer need and generally offer greater savings on prescription
> medication than our prescription offering does. We launched our first
> subscription offering, Gold, in 2017, ***and added a second offering,***
> ***Kroger Savings, in 2018. We receive subscriptions fees from***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*subscribers for these offerings, and for Kroger Savings we share a portion of these fees with Kroger. We recognize the subscription fees, net of Kroger's share, as revenue over the subscription period. We have significantly increased the number of subscribers who use our subscription offerings. The number of subscribers as of June 30, 2020 was 15 times higher than as of December 31, 2018.* Based on our data for the cohort of consumers who started using our subscription offerings between July 2018 and June 2019, we estimate that consumers of our subscription offerings have a first year contribution of approximately two times that of consumers of our prescription offering, which we expect will result in a substantially higher lifetime value for these consumers. First year contribution represents the cumulative revenue generated by consumers in the first year after they became consumers of our subscription offerings, less our estimated cost of revenue attributable to such revenue.[2]

67.    On November 12, 2020, the Company filed a current report on Form 8-K with the SEC, which included a letter to shareholders. The letter stated the following with respect to the Company's relationship with Kroger:

We extended our relationship as the exclusive prescription savings program for Kroger, America's largest grocery chain. The Kroger Rx Savings Club powered by GoodRx has provided hundreds of thousands of customers with exclusive access to discounts on commonly prescribed generic medications for widespread conditions in the U.S., including diabetes, asthma, mental health issues, women's health

---

[2] All emphasis is added unless indicated otherwise.

concerns, gastrointestinal issues and heart health. The program provides up to 85% savings on thousands of prescriptions. ***We're excited to make additional product and marketing investments in this plan now that it has been extended.***

68.    On November 18, 2020, Defendants Hirsch and Voermann spoke on behalf of the Company at the RBC Global Technology, Internet, Media and Telecommunications Conference. At the conference, Defendant Hirsch touted the Company's strong relationship with pharmacies, stating that GoodRx "was talking almost daily with [them]." Defendant Voermann continued, stating that "pharmacies are our friends . . . and we see that continuing far into the future."

69.    On December 3, 2020, Defendant Hirsch spoke at the Credit Suisse Technology Conference explained that the Company maintained strong relationships with pharmacies due to pharmacies' inability to set lower prices, stating "I know this is really hard for people to get through their head, but pharmacies cannot set their own prices without getting in a lot of trouble . . . they cannot just wake up tomorrow and go, 'we're going to make every drug X dollars.'"

70.    On December 8, 2020, during the UBS Global TMT Conference, Defendant Hirsch emphasized that the Company "help[s] PBMs . . . and pharmacies make money" by "[using] us as a way to drive prices because they can't do it themselves."

71.    On March 11, 2021, GoodRx filed an annual report on Form 10-K with the SEC (the "2020 Form 10-K"), signed by Defendants Hirsch, Bezdek, Voermann, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Giraud. With respect to the Kroger Rx Savings Club Plan, the 2020 Form 10-K stated that it is "designed to be easy to use and provide subscribers with added benefits and features."

72.    Also on March 11, 2021 the Company filed a current report on Form 8-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

K with the SEC, which included a letter to shareholders. The letter stated the following with respect to the Company's relationship with Kroger:

> We partner with Kroger, the nation's largest grocery chain and fourth largest retail pharmacy, to offer a unique subscription product to Kroger consumers for an annual fee. Subscribers get access to lower prescription prices at Kroger pharmacies, including over 100 common generic medications for free, $3.00, or $6.00, along with savings on more than 1,000 other generic medications. ***In 2020, our contract with Kroger was extended for multiple years and we are excited to continue our fruitful partnership.***

73.    On March 1, 2022, the Company filed an annual report on Form 10-K with the SEC ("the 2021 Form 10-K"), signed by Defendants Hirsch, Bezdek, Voermann, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Giraud. With respect to the annual subscription fees earned through the Kroger Rx Savings Club Plan, the 2021 Form 10-K stated that "[w]e believe these offerings have higher lifetime value than our prescription transaction offerings."

74.    The 2021 Form 10-K stated the following with the respect to seasonal demand for the Company's offerings:

> We typically experience stronger consumer demand during the first and fourth quarters of each year, which coincide with generally higher consumer healthcare spending, doctor office visits, annual benefit enrollment season, and seasonal cold and flu trends. In addition, we may experience stronger demand for our pharma manufacturer solutions offering during the fourth quarter of each year, which coincides with pharma manufacturers' annual budgetary spending

patterns. This seasonality may impact revenue and sales and marketing expense. The rapid growth of our business may have masked these trends to date, and we expect the impact of seasonality to be more pronounced in the future. In 2020 and 2021, we saw the impact of the COVID-19 pandemic further disrupt these trends and may continue in future periods.

75.    Under the header, "**Competition and Industry Participants**," the 2021 Form 10-K stated:

We believe that our primary barrier to adoption is awareness. Americans have historically not had to be active consumers of healthcare since benefit plans were more generous and open than they are today.

* * *

There is currently significant concentration in the U.S. healthcare industry, and in particular there are a limited number of PBMs, including pharmacies' in-house PBMs, and a limited number of national pharmacy chains. If we are unable to retain favorable contractual arrangements with our PBMs, including any successor PBMs should there be further consolidation of PBMs, we may lose them as customers, or the negotiated rates provided by such PBMs may become less competitive, which could have an adverse impact on our platform.

A limited number of PBMs generate a significant percentage of the discounted prices that we present through our platform and, as a result, we generate a significant portion of our revenue from contracts with a

-25-
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

limited number of PBMs. We work with more than a dozen PBMs that maintain cash networks and prices, and the number of PBMs we work with has significantly increased over time, limiting the extent to which any one PBM contributes to our overall revenue; however, we may not expand beyond our existing PBM partners and the number of our PBM partners may even decline. For additional information, see "We rely on a limited number of industry participants." in Part I, Item 1A, "Risk Factors" included elsewhere in this Annual Report on Form 10-K.

76.    Under the heading, "We rely on a limited number of industry participants," the 2021 Form 10-K continued:

Our consumers use GoodRx codes at the point of purchase at nearby pharmacies. These codes can be used at over 70,000 pharmacies in the United States. The U.S. prescriptions market is dominated by a limited number of national and regional pharmacy chains, such as CVS, Kroger, Walmart and Walgreens. These pharmacy chains represent a significant portion of overall prescription medication transactions in the United States. Similarly, a significant portion of our discounted prices are used at a limited number of pharmacy chains and, as a result, a significant portion of our revenue is derived from transactions processed at a limited number of pharmacy chains.

77.    With respect to the Company's subscription revenues, the 2021 Form 10-K stated, "[w]e expect *the percentage growth in subscription* and other revenue to continue to *outpace our prescription transactions revenue* as we continue to scale the capabilities and platforms of our subscription, pharma manufacturer solutions and telehealth offerings."

78.    Also on March 1, 2022, during an earnings call, Defendant Bezdek maintained that the Company's "relationships with PBMs remain great… [and that] relationships with [pharmacies] are very good."

79.    On March 15, 2022, during the Deutsche Bank Media, Internet and Telecom Conference, Defendant Voermann reiterated that the Company "ha[s] deep relationships with all of the big pharmacies out there… [and that] our relationship with all the big pharmacies, which is where all the volume flow through, are really strong."

80.    The statements identified above in ¶¶ 65-79 were materially false and misleading and omitted to state material adverse facts because they failed to disclose that: (i) Kroger accounted for roughly twenty-five percent of the Company's total prescription transactions revenue despite accounting for less than five percent of all pharmacies accepting GoodRx discounts; (ii) this dependence on Kroger was a substantial risk to the Company's ability to generate revenue; (iii) Kroger retained the right to unilaterally refuse to accept the Company's discounts; and (iv) the Company failed to implement and maintain adequate internal controls.

***The Truth Emerges***

81.    On May 10, 2022, GoodRx filed a quarterly report on Form 10-Q with the SEC for the Company's first fiscal quarter of 2022 (the "1Q2022 Form 10-Q"). The 1Q2022 Form 10-Q revealed a "grocer issue" and disclosed that "a grocery chain had taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs from PBMs" and signaled that this was "expected to have an adverse impact on prescription transactions revenue in the future that may be material."

82.    During the accompanying earnings call, hosted by the Company on the same day, Defendant Bezdek stated:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The [grocer issue] is [about] limiting acceptance of many [discount] programs at this grocer's pharmacy. This involves, to your point, essentially all PBMs. So this is across the vast majority of PBMs . . . In this case, this grocer is negotiating with almost all PBMs at the same time, and that effectively meant that discount pricing became unavailable to consumers at the same time.

83.    The Company further disclosed that the "grocer issue" accounted for "almost 1/4 of its prescription transaction revenue," while only accounting for less than 5% of the pharmacies that accept GoodRx discounts.

84.    Despite the Company's failure to identify Kroger as the grocer, industry analysts ascertained that the Company was referring to the Kroger Rx Savings Club Plan.

85.    On this news, the price of the Company's stock declined by roughly 25% in one day, closing at $7.97 per share on May 10, 2022.

86.    On August 9, 2022, GoodRx filed a quarterly report on Form 10-Q with the SEC for the Company's second fiscal quarter of 2022 (the "2Q2022 Form 10-Q"). The 2Q2022 Form 10-Q stated that "financial conditions continue to be difficult to estimate" due to the "impact of a grocery chain not accepting discounted pricing for a subset of drugs from our PBMs," but downplayed the issue by stating that "we expect our discounted pricing to be consistently welcomed at the point of sale by the grocery chain[.]"

87.    During the accompanying earnings call, held on the same day, Defendant Bezdek stated that "[w]e exited the second quarter seeing approximately 20% of the weekly volume we processed through [Kroger] before the issue beginning of March," before asserting that "the grocer issue has been addressed."

88.    On November 8, 2022, GoodRx issued a press release which was

-28-
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

included in the Company's current report, filed on Form 8-K with the SEC (the "November 8, 2022 Press Release"). In the November 8, 2022 Press Release, the Company revealed that "[t]he estimated impact of the grocer issue on third quarter [prescription transactions revenue] was approximately $40 million." The Company further disclosed that it expected a $45 to $50 million "estimated impact to prescription transactions revenue related to the previously disclosed grocer issue," despite Defendant Bezdek's prior claim that "the grocer issue ha[d] been addressed."

89.    During an earnings call, hosted by the Company on the same day, Defendant Bezdek disclosed that the "amount of prescription transactions revenue associated with the grocer decreased from $12.4 million to $4.3 million during th[e] period and [wa]s still well under the $33.7 million from third quarter 2021." Further, Defendant Hirsch revealed that pharmacies retained the right to unilaterally refuse to accept GoodRx discounts, as Kroger had done:

> We have continued to maintain our really strong PBM marketplace. But in addition, we are selectively direct contracting with pharmacies and including many of the largest chains. That hybrid model really lets us ensure network stability. We want to make sure we don't have, and we don't anticipate having, any similar issue.

90.    On this news, the price of the Company's stock declined by roughly 22% in one day, closing at $4.06 per share on November 9, 2022.

**Insider Sales**

91.    During the Relevant Period, Defendants Hirsch, Bezdek, Voermann, and Giraud (the "Insider Trading Defendants") each made unusually times sales while in possession of material non-public information concerning the Company's dependence on Kroger, the sustainability of the Company's revenues, and the Company's inadequate internal controls.

92.     The Insider Trading Defendants collectively reaped millions of dollars in profits selling their personal holdings of Company stock at prices as high as $45.24, more than ***1000%*** of the stock's closing price of $4.06 after the corrective disclosures.

***Stock Repurchases During the Relevant Period***

93.     During the Relevant Period, the Individual Defendants caused the Company to repurchase roughly 8,455,833 shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false and misleading statements.

94.     According to the 1Q2022 Form 10-Q, the Individual Defendants caused the Company to purchase 5,637,005 shares of its common stock at an average price of $14.86 between March 1, 2022 and March 31, 2022. As the price of the Company's common stock after the corrective disclosures was $4.06, the Company accordingly overpaid by roughly $60,879,653 for these repurchases.

95.     According to the Company's quarterly report, filed on Form 10-Q with the SEC on November 8, 2022 for the third fiscal quarter of 2022, the Individual Defendants caused the Company to purchase 2,818,828 shares of its common stock at an average price of $6.37 between September 1, 2022 and September 30, 2022. As the price of the Company's common stock after the corrective disclosures was only $4.06, the Company overpaid by roughly $6,511,492 for these repurchases.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

96.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

97.     GoodRx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

98.    Plaintiff is a current shareholder of GoodRx and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

99.    A pre-suit demand on the Board of GoodRx is futile and, therefore, excused. At the time this action was commenced, the ten-member Board was comprised of Defendants Bezdek, Hirsch, Adams, Bradley, Deb, Mondre, and Giraud (the "Director Defendants"), along with Kelly J. Kennedy, Simon Patterson, and Ian T. Clark, who joined the Board after the Relevant Period and are not parties to this action. Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least seven of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

100.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation. Further, each of the Director Defendants personally signed the 2020 Form 10-K and/or the 2021 Form 10-K, which contained materially false and misleading statements as alleged above.

101.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not

disinterested parties.

102.   Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

103.   Defendant Hirsch is not disinterested or independent. Defendant Hirsch co-founded the Company, serves as its Chief Mission Officer, and formerly served as the Company's co-CEO. Thus, the Company admits that Defendant Hirsch is a non-independent director.

104.   Defendant Bezdek is not disinterested or independent. Defendant co-founded the Company, serves as the Chairman of the Board, and formerly served as the Company's co-CEO. Thus, the Company admits that Defendant Bezdek is a non-independent director.

105.   Further, Defendants Hirsch and Bezdek are not disinterested or independent, and therefore, are incapable of considering a demand because they are named as defendants, and face significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein.

106.   Defendants Bradley and Giraud serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosures, internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their

fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

107.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

108.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

109.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

110.    The acts complained of herein constitute violations of fiduciary duties

owed by GoodRx's officers and directors, and these acts are incapable of ratification.

111.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of GoodRx. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of GoodRx, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

112.    If there is no directors' and officers' liability insurance, then the directors will not cause GoodRx to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

113.    Thus, for all of the reasons set forth above, all seven, or if not all, then at least five of GoodRx's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
### Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

114.    Plaintiff incorporates by reference and realleges each and every

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

allegation contained above, as though fully set forth herein.

115.   The Individual Defendants participated in a scheme with the purpose and effect of defrauding GoodRx. Not only is GoodRx now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon GoodRx by the Individual Defendants.

116.   The Company repurchased 8,455,833 shares of GoodRx stock between March 1, 2022 and September 30, 2022 at prices artificially inflated by the materially false and misleading statements and material omissions described above.

117.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

118.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about GoodRx not misleading.

119.   The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by GoodRx.

120.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the

misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

121. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### Against the Individual Defendants
### For Breach of Fiduciary Duty

122. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

124. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

125. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

126.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

127.    Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

## COUNT III
### Against the Insider Trading Defendants
### For Breach of Fiduciary Duties (*Brophy* Claim)

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects.  Notwithstanding their duty to refrain from trading in GoodRx common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

130.    The insider sales detailed herein, were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

131.    The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants

misappropriated to their own benefit when they sold GoodRx stock. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

132.   Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

133.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

135.   Plaintiff on behalf of GoodRx has no adequate remedy at law.

## COUNT V
### Against the Individual Defendants for Unjust Enrichment

136.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.   By their wrongful acts, violations of law, and false and misleading

statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GoodRx.

138.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from GoodRx that were tied to the performance or artificially inflated valuation of GoodRx, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

139.   The Insider Trading Defendants were further unjustly enriched with respect to insider sales of Company stock.

140.   Plaintiff, as a shareholder and a representative of GoodRx, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

141.   Plaintiff on behalf of GoodRx has no adequate remedy at law.

## <u>COUNT VI</u>
### Against the Individual Defendants for Abuse of Control

142.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.   The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

144.   As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

145.   Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

148.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

149.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

150.    Plaintiff on behalf GoodRx has no adequate remedy at law.

151.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock

awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 26, 2024

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: *s/ Rachele R. Byrd*

BETSY C. MANIFOLD
RACHELE R. BYRD
ALEX J. TRAMONTANO
750 B Street, Suite 1820
San Diego, CA  92101
Tel: (619) 239-4599
Fax: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600

-41-
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Philadelphia, PA 19103
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION OF COLBY MAYES</u>

I, Colby Mayes, am a plaintiff in this action.  I have reviewed the allegations made in the

Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.

As to those allegations of which I have personal knowledge, I believe those allegations to be true.

As to those allegations of which I do not have personal knowledge, I rely upon my counsel and

their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: ___8/21/2024___

DocuSigned by:

*Colby Mayes*

6CE143DEC00B4B4...

Colby Mayes